Argued February 8; affirmed April 17, 1934

# HYDE ET AL. *v.* ALBERT E. PEIRCE & CO. ET AL.

## (31 P. (2d) 755)

Action by Ida J. Hyde and another against Albert E. Peirce & Co., and another, to recover from named defendant, broker, and its surety on broker's bond, amount paid for corporate stock, because of alleged fraud inducing its purchase. From a judgment in favor of plaintiffs, defendants appeal.

*Harry J. DeFrancq,* of Portland (J. S. Moltzner, of Portland, on the brief), for appellants.

*A. G. Fletcher,* of Portland, for respondents.

*Sheppard & Phillips* and *L. J. Balbach,* all of Portland, amici curiae.

KELLY, J. This case presents the question whether there is a legislative requirement to the effect that a broker's bond should be conditioned upon such broker conducting his business in such a way as to conform to the Blue Sky Law and particularly to be free from fraudulent practice.

It is urged by defendants and amici curiae that prior to the enactment of chapter 166 of the 1931 Session Laws there was no such legislative requirement. In other words, these parties argue that the bond required by section 25-1309, Oregon Code 1930, is a qualifying bond and not an indemnity bond. It is said that by a qualifying bond is meant one, which evidences that the applicant for a broker's permit, who tenders such a bond, is of financial and moral worth. The further purpose of the bond, it is thus argued, is that the surety company, rather than the corporation department would make the needed investigation as to the broker's financial condition and conduct. In that regard, said section provides that at the time of applying to the corporation commissioner for a permit to do business as a broker, such broker "shall file a corporate surety bond, executed by a surety company satisfactory to the corporation commissioner in the sum of $5,000, in such form and upon such conditions as the commissioner may designate".

It is argued that the last clause of the foregoing excerpt from the statute, namely, "in such form and

upon such conditions as the commissioner may designate", is merely an attempt to invest the commissioner with legislative authority. Conceding, without deciding, that such is the case, we still have a statutory mandate that the broker shall file a corporate surety bond in the sum of $5,000. To determine the condition of said bond required by law in question, we need only to look to the purpose of the statute. Originally, the section under consideration was section 13 of chapter 341 of the 1913 Session Laws, pp. 673-4. The title of that act is as follows:

"An act to protect purchasers of stocks and bonds and prevent fraud in the sale thereof; to create a corporation department to administer this and other laws relating to the regulation and supervision of corporations, and providing penalties for the violation hereof."

In 1915, the legislature amended said chapter 341 of the 1913 Session Laws by chapter 324 of the 1915 Session Laws, page 495, et seq. We quote a portion of the title of said chapter 324:

"An act * * * to protect the purchasers of stock, bonds, notes, contracts or other securities; to prevent fraud and misrepresentation in the securing of subscriptions thereto, or in the issuance, transfer, sale, promotion, negotiation or distribution thereof; to define dealers in securities; to provide for the supervision over and regulation of such dealers and such securities by the Corporation Commissioner, and to provide penalties for the violation of this act."

In 1921, the act was again amended. Chapter 400 of the Session Laws for 1921 comprised such amendment. The title of said chapter 400 is as follows:

"An act to amend sections 6838, 6840 and 6843, Oregon Laws, relating to the regulation of dealers engaged in the buying and sale of stocks, stock certifi-

cates, bonds, debentures, notes, contracts, membership certificates and securities of every kind and character, and defining the same.''

In 1923, another amendment was enacted. It comprises chapter 189 of the Session Laws of 1923, p. 271, et seq. The title of said chapter 189 is as follows:

''An act to amend sections 6839, 6840 and 6846, Oregon Laws, as amended by General Laws, 1921, relating to the regulation of dealers engaged in the sale of stocks and bonds.''

None of the session laws above mentioned required a bond to be filed by the broker. In 1929, however, the legislature again amended the law and thereby incorporated therein the provisions first hereinabove quoted requiring a bond as a prerequisite to the issuance of a permit.

Both in the original act (1913 Session Laws, chapter 341, pp. 673-4) and in the first act amendatory thereof (1915 Session Laws, chapter 324, p. 495) the purpose of the legislature is clearly stated in the titles of said legislative enactments as being to protect purchasers of stocks and bonds and to prevent fraud in the sale thereof.

That being the purpose of the law, the subsequently enacted requirement, that a bond should be given as an additional prerequisite to the issuance of a permit to any person to do business as a broker, very clearly imports that the condition of the bond should be that such broker should not commit any fraud in the sale of stocks and bonds, or in any other respect while acting as a broker.

The bond in suit contains the following terms:

''The conditions of this obligation are such, that whereas the above bounden principal has applied to

the Corporation Commissioner of the State of Oregon for a Broker's Permit in accordance with chapter II of title XXXIX, Oregon Laws, as amended, known as the 'Blue Sky Law';

"Now, Therefore, if the said principal, its officers, agents, employes and trustees, shall conduct and carry on its said business as a Stock and Bond Broker without fraud or fraudulent representation, and shall comply with all the requirements and provisions of said act, and acts amendatory thereof, and shall honestly and faithfully perform every undertaking and agreement entered into by it as a licensed broker under said act, and shall refrain from doing any act or thing, and from any conduct constituting improper, fraudulent or dishonest dealing, within the meaning of said act, then this obligation shall be void; * * *."

The conditions just quoted conform to the intent, purpose and object of the statute in question, as expressly stated in the titles above set out and as reflected in the general tenor and effect of the law itself. When the bond was executed and the premium thereon paid, both defendants must have so understood it.

"In the construction of a statute the intention of the legislature, and in the construction of an instrument the intention of the parties, is to be pursued, if possible.": Section 9-215, Oregon Code 1930.

The case of *People v. J. O. Beekman & Co.*, 347 Ill. 92 (179 N. E. 435), construes a statute requiring an applicant for registry as a broker authorized to sell securities to furnish a bond of not less than $2,000 nor more than $50,000. That statute also provides:

"In fixing the penalty of such bond the secretary of state shall investigate and take into consideration the proposed method of transacting business and the financial standing of the applicant for registration and the experience, ability and general reputation for integrity of such applicant or in the case of a corpora-

tion of its officers, managers and principal agents and shall fix such a penalty as in his opinion will protect from loss, persons dealing with such applicant if registered.''

The court said:

''There is nothing to indicate how much experience or ability or what amount of capital shall be necessary to justify the secretary of state in fixing the bond at the minimum amount and when the maximum amount shall be required.''

This clearly distinguishes that case from the one at bar because the statute of Oregon leaves no discretion in the corporation commissioner as to the amount of the penal sum of the bond required. The same distinction is apparent with reference to the case of *People v. Federal Surety Co.,* 336 Ill. 472 (168 N. E. 401), except that there the court referred not only to the fact that no one could tell the amount of the bond required, but also that the conditions which it should contain were undetermined until the secretary of state had fixed the amount and the terms and conditions in each particular case. There, the rule stated in Sutherland on Statutory Construction, section 68, is quoted as follows:

''The true distinction is between a delegation of power to make the law, which involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no objection can be made.''

*Merton v. Hansen,* 200 Wis. 576 (229 N. W. 53), is a case wherein the statute provided that each town board shall grant licenses to such persons as they deem proper for the sale of nonintoxicating liquor. The statute did not prescribe that a bond should be given.

The town board required a bond. The court held such bond to be unenforcible. The distinction between that case and the one at bar is that the statute controlling the case at bar requires that a bond shall be given.

The rule announced in *State ex rel. Hagquist v. U. S. F. & G. Co.,* 125 Or. 13 (265 P. 775), is that public policy requires that the liability of a surety upon the bond of a contractor, engaged in the performance of public work, should include but not be extended beyond that prescribed by statute.

*Portland v. Bituminous Paving Co.,* 33 Or. 307 (52 P. 28, 44 L. R. A. 527, 72 Am. St. Rep. 713), holds that the city was without authority to require an independent undertaking of a street improvement contractor to keep the street and pavement in repair for a given number of years after the completion of his contract. In part, that holding is based upon the requirement of the city charter concerning the improvement of streets and the assessment of the cost thereof against the adjacent property. The case at bar presents no such phase of the law.

*Swinney v. Connecticut Fire Ins. Co.,* 8 S. W. (2d) 1090, holds that a statement in an insurance certificate accepted by plaintiff that it ''is accepted subject to all the terms, conditions and stipulations embraced in the standard fire insurance form'', made the terms of the statutory standard form of policy part of the insurance agreement by reference.

*Dowling v. Lancashire Ins. Co.,* 92 Wis. 63 (65 N. W. 738, 31 L. R. A. 112), holds a law unconstitutional, which purports to delegate to the insurance commissioner authority to prepare, approve and adopt a printed form in blank of a contract or policy of fire insurance, which would as near as the same can be

made applicable, conform to the type and form of the New York standard fire insurance policy. The Wisconsin statutes were in conflict with certain provisions of the New York standard form of policy.

The court said:

"Evidently, the conformity to 'type and form' of the New York standard policy, had reference to the form of that policy as embracing the substance of the provisions of the contract, and as to the size and kind of type to be used in printing the policy to be adopted."

There is no suggestion in the case at bar that an attempt should be made by the corporation commissioner to adapt the terms and conditions of the bond in suit to that prescribed in a sister state.

■■ Being guided by the plain intent and purpose of the statute under consideration as disclosed by the titles employed in its enactment and amendments, and as clearly and unmistakably set forth in the context; and feeling that it is our duty to give effect to every part of the statute, if possible, we construe the statute to require a bond in the sum of $5,000 conditioned upon a compliance with the terms and provisions of said statute which prohibit fraud and misrepresentation. This construction renders the undertaking effective as written.

We are unwilling to adopt a construction which converts the requirements that a corporate surety bond be given into a substitution of the surety company giving it for the corporation department in the matter of investigating the methods, practices and standing of the broker to whom a permit has been issued. One reason for this is that no recovery could be had on the bond if its purpose and conditions were so restricted. The only actionable breach would be the failure of the

surety company to make an investigation and in no event could such failure cause any injury or damage to the state as distinguished from the individuals who might suffer because of the fraud practiced by the broker. There being no liability on the part of the surety company, we doubt that any investigation worth while would be prosecuted by it. Another reason is that the surety company is without the authority to issue process to compel the attendance of witnesses and the production of records, while, on the other hand, the corporation commissioner is given plenary power in that regard. Another reason is that such a construction does violence to the provisions of the statute conferring upon the corporation commissioner such authority. Another reason is that the legislature in all of its enactments on the subject nowhere gives the slightest express utterance to such effect.

A case very similar to the one at bar was considered by the supreme court of North Carolina. The opinion was rendered by Mr. Justice Clarkson. It construed a statute which provided that:

"No person shall transact or offer to transact business in this state, * * * unless such person shall hold a license issued by the insurance commissioner. The license shall issue only upon the filing with the insurance commissioner by such agent of a bond in the sum of one thousand dollars ($1,000), with such conditions and sureties as may be required and approved by the insurance commissioner."

We quote from the opinion in that case:

"It is a matter of common knowledge that millions of dollars were lost in this state through these organizers, promoters, and their agents—men and women made homeless by investing in worthless stocks and bonds, savings of a lifetime in many cases swept away,

financial wreckage and ruin following the wake of these irresponsible foreign and domestic corporations that sold nothing for something, the honor of men dealing in such fraudulent schemes smirched and destroyed. Often as an inducement and bait, large dividends were offered and guaranteed. The intent of the statute, under the police power of the state, was to protect the people of the state from this kind of fraud and imposition. The police power of a state is broad and comprehensive. It is elastic so that the governmental control may be adequate to meet changing social, economic, and political conditions. Under the United States Constitution, the police power has been left to the states—in fact, it is inherent in the states. Each state has the power to regulate the relative rights and duties of all persons, individuals, and corporations within its jurisdiction for the public convenience, welfare, and good—for public health, public morals, and public safety. The only limit is that no law shall be enacted repugnant to the Constitution of the United States or the state. Durham v. Cotton Mills, 54 S. E. 453, 141 N. C. 615, 7 L. R. A. (N. S.) 321; Shelby v. Power Co., 71 S. E. 218, 155 N. C. 196, 35 L. R. A. (N. S.) 488, Ann. Cas. 1912C, 179; Shields v. Harris, 130 S. E. 189, 190 N. C. 527; Moore v. Greensboro, 132 S. E. 565, 191 N. C. 592; 6 R. C. L., § 188-190.

\*　　\*　　\*　　\*　　\*

"The defendant surety company signed these bonds, received the premium, and now, after allegations of fraud and misrepresentations, are charged against the principals in the bond and suit brought on the bonds by the party injured, defendant is taking the position that the insurance commissioner had no authority to take such a bond, although with full knowledge of the law it signed the bonds as surety. There is no uncertainty or ambiguity about the bond. If the bonds were not to protect those who were defrauded in the purchase of the stocks, etc., for what purpose were the bonds given? The defendant surety company received premiums on and signed what it now contends are illegal bonds. It received the benefits of the premiums,

it ought to bear the burden it assumed. There is no reason in law or morals why the defendant surety company should not be held to its solemn contract." Smith v. Fidelity & Deposit Co. 191 N. C. 643 (132 S. E. 792).

We are confronted with the further question whether an action can be maintained on said bond in the name of the persons claiming to have been damaged.

It is argued that the bond in suit contains no promise to pay anybody anything, but merely a condition, the performance of which exonerates the surety. The bond provides that the principal and surety therein named, who are the defendant herein, "are held and firmly bound in the full penal sum of five thousand dollars ($5,000.00), lawful money of the United States, for the payment of which, well and truly to be made, we, and each of us, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents".

The case of *Pankey v. National Surety Company*, 115 Or. 648 (239 P. 808), is cited. The doctrine of that case is that the rule giving to third parties the benefit of a contract to which they are not parties is limited to those contracts which have for their primary object the benefit of a third person. It is but a repetition of the holding in *Parker v. Jeffery*, 26 Or. 186 (37 P. 712).

Unless the bond in suit had for its primary object the benefit of those who might buy from or otherwise deal with the broker defendant, we are at a loss to know what its primary object was. Certainly not merely to commend the broker defendant as worthy of a permit. A well-written letter would suffice for that. Certainly not to lull the corporation commissioner into the absurd belief that a surety company, which is not

subject to more than nominal liability, would prosecute a rigid investigation of the broker's transactions and report to the commonwealth the result of such investigation.

*American Surety Company of New York v. Steen,* 86 Okla. 252 (208 P. 212), construes a bond given pursuant to chapter 279 of the Oklahoma Session Laws of 1915. Section 16 of that act prescribed the conditions of the bond thus:

"He will buy and sell only stock which has been duly inspected and certified by an official State Inspector; and that he will maintain with the Board a list of all sources from which he secures his stock."

In its opinion, the court states:

"There is no allegation that the obligor sold stock which had not been duly inspected, and no contention that he violated the terms of section 16 in any manner."

In the case at bar a violation of the terms of the bond is charged.

We quote further from *American Surety Company of New York v. Steen,* supra:

"According to the provisions of section 16 of said act, which is (the) section requiring the bond, it is merely a penal bond given to enable the board of agriculture to better enforce its regulations in regard to inspection of stock and in regard to information as to the source of nursery stock coming into the state."

For reasons above stated, we construe the statute controlling the case at bar as having a broader and more comprehensive purpose.

On sealed instruments, under the common law, only the obligee named could institute an action. In the absence of statutory authority, therefore, an action

upon the bond in suit should be prosecuted in the name of the state of Oregon on the relation of the real party or parties in interest.

██ In 1931, which was subsequent to the date of the bond, the statute under consideration was amended by chapter 166 of the 1931 Session Laws at page 232, et seq. This amendment provided that—

"Any person suffering loss or damage arising out of a violation of this act by any dealer or broker who has furnished a bond under the provisions of Title XXV, Chapter XIII, Oregon Code 1930, may sue on said bond in his own name."

The question, therefore, resolves itself into whether the amendment of 1931, last above quoted, affects contractual rights or only changes the procedure to be followed. If contractual rights were affected, the amendment could not be given retroactive effect. *Spicer et al. v. Benefit Association of Railway Employees,* 142 Or. 574 (17 P. (2d) 1107, 21 P. (2d) 187). We think that the amendment does not affect contractual rights, but merely changes the manner of entitling the action. In other words, in the absence of the amendment, the names of the parties plaintiff would be the State of Oregon on the relation of Ida J. Hyde and Alice F. Hyde; while under the amendment the names of the parties plaintiff are as they appear herein. Such being the case, we hold that the 1931 amendment, above set out, should be given retroactive effect and that plaintiffs are the proper parties plaintiff in their own names.

It is urged that the statements, the alleged falsity of which constitutes the basis of the fraud alleged herein, are mere statements of opinion and not of material facts upon which a charge of fraud may be based.

Representations by defendant Albert E. Peirce & Company to plaintiffs are alleged in the third amended complaint to have been made through the words, acts and conduct of its agent and by its own acts and conduct:

"(1) That the shares of the said security which the said agent had for sale were the individual property of fellow employees. This representation was false in that the said shares were being issued to purchasers direct by the Central Public Service Corporation and had never been owned by anyone.

"(2) That the company in which the agent was selling stock was the company by which the said agent had been and was employed as auditor. This representation was false in that the stock being sold was in the Central Public Service Corporation, a Maryland corporation, while the agent had been and was employed as auditor by the Pacific Northwest Public Service Company, an Oregon corporation.

"(3) That the said security was a safe investment. This representation was false in that the said security was generally recognized by experts as being speculative and low class, and it was not an investment in the correct sense of the word.

"(4) That by reason of the said agent's employment as auditor of the said local public utility aforesaid, he necessarily knew the facts as to the safety of the said investment. This representation was false in that as one of the auditors in the employ of the Pacific Northwest Public Service Company he had, by virtue thereof, no special knowledge of the affairs of the Central Public Service Corporation.

"(5) That the defendant, Albert E. Peirce & Company, would at all times take back the said securities and return plaintiffs' money to them. This representation was false in that when made, the defendant, Albert E. Pierce & Company, had no intention of carrying out this representation.

"(6) That the Central Public Service Corporation owned and profitably operated a public utility plant in Seattle and various other plants in other parts of the country, the claimed location of which other plants the plaintiff does not remember. That these representations were false in that the said public utility plant in Seattle was owned and was then being operated at a loss by the Seattle Gas Company, a Washington corporation, and the Central Public Service Corporation did not own and operate any public utility plants whatever."

The agent of defendant and plaintiffs were members of the same church; their social relations were cordial and friendly. The agent was assistant chief clerk in the accounting department of the Portland Electric Power Company. Said agent's employment in that capacity was well known to plaintiffs. Plaintiffs were unaware that said agent was acting as agent for defendant Albert E. Peirce & Company in selling the stock in suit upon a commission. No public record of such employment was available to plaintiffs because said agent was not registered with the corporation commissioner. No good purpose will be served by recounting the testimony. Suffice it to say that upon a full consideration of the record, including the testimony of said agent, we find evidence tending to support plaintiffs' allegations to the effect that by words, acts and conduct the representations were made as above set out. In saying this, we do not mean that there is testimony tending to show that said agent represented himself as the auditor of the Central Public Service Company. The theory of plaintiffs is that it was stock of the corporation by which said agent was known by plaintiffs to be employed that was the subject of the sale.

■■ It is urged that a representation that purchase of any specific property is a safe investment is merely an expression of opinion and not a statement of a material fact.

As stated in *Boelk v. Nolan,* 56 Or. 229, 237 (107 P. 689):

"A matter of opinion may amount to an affirmation of fact, when the parties are not dealing upon equal terms, and one of them has, or is presumed to have means of information not equally open to the other."

The facts in the case at bar warranted the submission to the jury of that phase of the case. See *Smith v. Griswold,* 6 Or. 440; *Lentz v. Landers,* 21 Ariz. 117 (185 P. 821), cited in note 42 of annotation, pp. 82 and 83 of Vol. 51 A. L. R.

The jury has passed upon the effect of this evidence and we are not justified in substituting our judgment thereon for that of the trial jury.

■■ Defendant's third ground for their motions for nonsuit was that there was no evidence of damage in the record. They seek to invoke the measure of damages recognized in the case of *Van De Wiele v. Garbade,* 60 Or. 585 (20 P. 752), which is the difference between the amount paid and the reasonable value of the stock at the time of purchase. Defendants say that apparently the case at bar "is an action at law for damages for fraud in the sale of securities even though a certificate of stock is tendered into court".

We think that the case is in the nature of an action for money had and received. Such an action may be maintained to recover money paid for corporate stock where it is shown that the sale was induced by fraud and the purchaser, upon discovering the fraud, prompt-

ly gives notice to the seller that he, the purchaser, repudiates and rescinds the transaction and returns or offers to return the stock. In cases where the seller discloses that he will not accept a return of the stock, if offered, an actual tender thereof is not required. We are persuaded that the institution by plaintiffs herein of a suit to rescind the sale of the stock involved in this case constituted due notice to defendant of plaintiffs' repudiation of the transaction and that the answer of defendant Albert E. Peirce & Company in said suit, in effect denying that plaintiffs had rescinded or were entitled to rescind the sale in question could be considered by the jury as constituting a waiver by said defendant of its right to require a return or offer to return said stock. In this connection, we are not unmindful that in the said suit plaintiffs alleged, as an excuse for not making a return or an offer to return said stock, that the same was valueless, and that the record in the case at bar tends to show that such stock was of some value when the same was sold by defendant Albert E. Peirce & Company to plaintiffs.

No exception was taken to the manner in which the trial court treated this phase of the case, and we mention it to avoid creating the impression that we hold, as some courts do, that even in the absence of a waiver thereof, a return or an offer to return the property received is not a prerequisite to the maintenance of an action of this character.

This case is to be distinguished from one where a broker, acting as such, negotiates a sale of stock owned by his principal. Here it appears from the answer of defendant, Albert E. Peirce & Company, in the suit in equity to which reference has just been made, that said defendant sold to plaintiff said 67 shares of said

stock at $60 per share, and that plaintiffs paid defendant therefor and that defendant delivered to plaintiffs the requisite certificate of stock.

Exception was taken to the admission in evidence of four carbon copies of purported documents. The first is designated "Report for C. P. S. Corporation". It is addressed to Mr. T. A. Brown and below the space for the signature there is typed the name, Robert H. Ennis. The initials "R. H. E." were typed in the lower left-hand corner. This document is known to the record as plaintiffs' exhibit No. 15.

The second, third and fourth of these carbon copies are copies of letters purporting to have been sent to "Mr. H. H. Hudman, Manager, Customer-Ownership Albert E. Peirce & Company, 105 West Adams St. Chicago, Ill."

On each of them below the space for the signature is typed, "W. H. Bell, Asst. Mgr. Customer-Ownership" and in the lower left-hand corner the initials "W. H. B." These copies are known to this record as plaintiffs' exhibits 16, 17 and 18.

The record discloses that "Customer-Ownership" is a term employed by defendant, the Albert E. Peirce & Company, to designate a department in its operations which was devoted to a campaign of selling stock of the Central Public Service Corporation to the customers and patrons of said last named corporation.

In support of the trial court's action in receiving these carbon copies in evidence, it appears that the Albert E. Peirce & Company was an Illinois corporation with its principal office in Chicago. It ceased all selling operations in Oregon on December 31, 1931. The name of its vice president in charge of its Oregon sales campaign was T. A. Brown. His residence was in Chicago. The name of its local representative in charge

of its Portland sales campaign during May, 1930—the date of exhibit 15—was Robert H. Ennis. His address, at the date of the trial, was not known to the witnesses, who were interrogated with reference to it. During the months of August and September, 1930, in which exhibits 16, 17 and 18 are dated, W. H. Bell was the local representative of the Albert E. Peirce & Company in charge of the Portland sales. The name of one of its employees was H. H. Hudman.

When the Albert E. Peirce & Company ceased operations in Portland, on December 31, 1930, Mr. Peter McIntosh, who for many years had been employed by the Portland Electric Power Company, and who was then its assistant treasurer, and secretary for the Consolidated Securities Company, was placed in charge of the records of the Albert E. Peirce & Company by the Public Utilities Commissioner, Hon. Charles M. Thomas. These records were in the office of the Peirce company and after the commissioner took charge evidently were safely kept by an experienced and reliable man. Agents acting for Judge Thomas, in his official capacity as commissioner aforesaid, searched through the documents thus left by Albert E. Peirce & Company and, among others, the exhibits in question were found. One of these agents identified the carbon copies in question as being so found by him. Mr. H. H. Hudman, testified that he had received a great many letters from Mr. Bell, but did not positively identify plaintiffs' exhibit 18. Notice to produce the originals of these copies was served upon the attorneys for the defendants 31 days before the trial commenced.

We think that the foregoing facts sufficiently tend to show that original documents of which these exhibits are carbon copies were actually transmitted as claimed by plaintiffs, and that, therefore, the learned

trial judge did not err in receiving the carbon copies in evidence. There is no evidence which disputes or denies that such originals were so sent. A somewhat similar showing was made in the case of *Gerking v. Laidlaw,* 59 Or. 116, 122 (114 P. 922).

■ Error is also predicated upon the admission in evidence of certain sheets of typewritten paper. By stipulation, this exhibit has been retyped upon but two pages. No criticism of that procedure is intended because it is mentioned, but the record refers to that exhibit as "pages 10, 11 and 12 of this file". These pages were marked as plaintiffs' exhibit 13.

The identification, if any, of this document by witness Jarvis, to say the least, is confusing. This witness had given a deposition, but had not signed it.

We quote the record:

"Q. No, Mr. Jarvis, you are at page 46 of the transcription of this deposition, in which you notice that we are speaking of an exhibit called exhibit P, in which you will notice that in the back of the deposition is a copy of this same letter, and on the top of page 47, on which this question by me appears: 'How did it come into your hands?'—we are speaking now of that letter —Answer: 'I think I received a copy of it.' Question: 'From whom, do you remember?' Answer: 'I don't know, I think Brown sent it to me.' Question: 'What makes you think so?' Answer: 'Because I think Bell sent it back to him.' Question: 'Beg your pardon?' Answer: 'I think Bell sent it to Brown and Brown sent it to me.'

"A. Mr. Fletcher, you are talking of two different things here. You are talking of a letter that Brown sent, and this here—I am referring to this—I have never seen this letter except at the Thomas hearing.

"Q. Possibly I am in error.

"A. This was not directed to me. This letter was sent by Brown to Mr. Coldwell, the Vice-President. I

have never seen that letter. But I have seen this here. Now, are you talking of this, or this (indicating)? This I have seen (indicating). You are speaking of this letter (indicating). I am talking of this letter (indicating).

"Q. Entirely immaterial.

"A. This is a different letter entirely. I have never seen this letter, except the one you exhibited to me, this one here I have seen (indicating). I think that is just exactly how I testified, and I think that is how it came in my possession, I think he sent it to me. Mr. Fletcher: At this time I withdraw—No, I won't do that. I will offer for identification pages 10, 11 and 12 of this file as one exhibit.

"The Clerk: Marked 'Plaintiffs' Exhibit 13'. Have you seen it? He is offering it.

"Mr. Moltzner: Are you offering it?

"The Court: Identifying it.

"Mr. Fletcher: Merely for identification.

"(Said papers were thereupon marked for identification 'plaintiffs' Exhibit 13'.)"

Those present and observing the witness could discern which document was indicated by "this" and which by "that". We cannot. We are unwilling to hold that it affirmatively appears from such a record that the learned trial judge erred in receiving the exhibit in evidence.

We cannot agree with defendants in their contention that the sale was transacted outside of the state of Oregon, and that it was ratified by the surrender of the certificates. In saying this, we are applying a construction most favorable to plaintiffs. In other words, we hold that there is evidence tending to support plaintiffs' claim that plaintiffs agreed to purchase stock in the Portland Electric Power Company owned by local employees of that company; that plaintiffs did not discover that no such stock had been de-

livered to them until after they had delivered to defendant Albert E. Peirce & Company some of the certificates for resale or redemption, and that the alleged fraud was committed whereby plaintiffs were induced to take other and different corporate stock than that for which they bargained. In thus dealing with the facts, we are simply following the course taken by the trial jury and not in any sense indicating how this court would have solved the various contested issues.

 Error is also predicated upon the giving by the trial court of an instruction relating to the law of fiduciary relationship, on the ground that there is no evidence of a fiduciary relation between Albert E. Peirce & Company and the plaintiffs. There is evidence, however, tending to establish a fiduciary relationship between plaintiffs and the agent of defendant Albert E. Peirce & Company, who negotiated the sale of the stock in suit.

A principal cannot receive the fruits of a bargain without being responsible for the fraud through which it was effected: *White v. Gordon et al.,* 130 Or. 139 (279 P. 289); *Sharkey v. Burlingame Co.,* 131 Or. 185 (282 P. 546); Benjamin on Sale, (7th Ed.) 493; *Carr v. National Bank,* 167 N. Y. 375 (60 N. E. 649, 82 Am. St. Rep. 725); *Krumm v. Beach,* 96 N. Y. 398; *Elwell v. Chamberlin,* 31 N. Y. 611; *Rhoda v. Annis,* 75 Me. 17 (46 Am. Rep. 354); *Haskell v. Starbird,* 152 Mass. 117 (142 N. E. 695, 23 Am. St. Rep. 809); *Haynor Mfg. Co. v. Davis,* 147 N. C. 267 (61 S. E. 54, 17 L. R. A. (N. S.) 193). No prejudicial error was committed in this respect.

Finding no prejudicial error, the judgment of the circuit court is affirmed.

BELT, J., not sitting.