**WHEELER v. UNITED STATES.**
No. 11440.

United States Court of Appeals
District of Columbia Circuit.

Argued June 22, 1953.

Decided Nov. 27, 1953.

Petition for Rehearing in Banc Denied
Jan. 28, 1954.
Writ of Certiorari Denied
June 7, 1954.

See 74 S.Ct. 876.

Fahy, Circuit Judge, dissented.

Mr. Claire O. Ducker, Sr., Washington, D. C., for appellant.

Mr. William J. Peck, Asst. U. S. Atty. at time of argument, Washington, D. C., with whom Messrs. Leo A. Rover, U. S. Atty., and Martin J. McNamara and E.

Riley Casey, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. Mr. William R. Glendon, Asst. U. S. Atty. at time brief was filed, Washington, D. C., was also on the brief. Messrs. Charles M. Irelan, U. S. Atty., and Joseph M. Howard, Asst. U. S. Atty. at time record was filed, Washington, D. C., also entered appearances for appellee.

Before BAZELON, FAHY and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

Appellant was convicted of having carnally known and abused a ten-year-old girl—the child of his common-law wife by a former marriage. The elements of the crime under the statute are (1) penetration (2) of a child under the age of sixteen.[1]

The conviction followed a trial in which the child refused to testify against appellant, despite her earlier statements to police and grand jury incriminating him. Although the earlier statement to the police was introduced at the trial to impeach the child's testimony exonerating appellant, it did not constitute direct evidence of the crime charged.[2] Hence, the main props of the prosecution's case-in-chief are medical testimony indicating penetration and testimony of the child's maternal grandmother that she heard the child make a statement connecting appellant with the assault charged. There was also evidence, pro and con, that appellant had used threats to coerce the child and her

mother to change prior accounts of what had occurred and that he sought unsuccessfully to coerce others to do the same. In addition, the child's mother, who had given an earlier accusatory statement to the police, solemnized her common-law relationship to appellant in a religious wedding ceremony before trial and then invoked the privilege not to testify against her husband. We discuss appellant's objections to the medical testimony and that of the grandmother before turning to other problems raised by this appeal.

To establish penetration, the prosecution relied primarily on the testimony of Dr. J. F. Mangum, an intern at Gallinger Municipal Hospital, and J. C. Stone, a bacteriologist and assistant supervisor of the hospital's laboratory.[3] Dr. Mangum testified that, although his examination of the child about two hours after the alleged assault revealed considerable reddening of and recent traumatization to the genital area, he could not say "there had been any intercourse of this child within a matter of two hours." After stating that he had taken an urethral and a vaginal smear from the child and placed each upon a separate slide for delivery to the hospital laboratory for microscopic examination by technicians, he was shown two slides bearing smears and asked to identify them. In response, he said, "These are the slides of the type used for us to make our smears at Gallinger Hospital." He was then asked if he could identify them more specifically, to which he replied, "Yes. There is a name scratched on this

---

1. D.C.Code § 22–2801 (1951) provides:
 "Whoever has carnal knowledge of a female forcibly and against her will, or carnally knows and abuses a female child under sixteen years of age, shall be imprisoned for not more than thirty years: *Provided*, That in any case of rape the jury may add to their verdict, if it be guilty, the words 'with the death penalty,' in which case the punishment shall be death by electrocution: *Provided further*, That if the jury fail to agree as to the punishment the verdict of guilty shall be received and the punishment shall be imprisonment as provided in this section."

 Holmes v. United States, 1948, 84 U.S. App.D.C. 168, 169, 171 F.2d 1022, 1023, requires proof of penetration for conviction of this crime.

2. The admissibility of the statement as substantive evidence under the "spontaneous exclamation" exception to the hearsay rule was not argued before the court and consequently has not been considered.

3. Contrary to appellant's contention, we think the record amply supports the trial court's ruling that Dr. Mangum and Mr. Stone were qualified to testify as expert witnesses.

slide," and proceeded to read the letters of the child's last name. Then the following occurred:

"Q. And are those the slides which you transmitted through channels to have examined by your bacteriologist, or by your bacteriological laboratory, in connection with this particular examination of [the child]? A. We have her name on them. *I cannot say that these are definitely the slides that we have made;* but they certainly have her name on them. They are the slides of the type that we use, and labeled as we label them.

"Q. Do you have a date on there? A. 8–11–51." (Emphasis supplied.)

Bacteriologist Stone testified that slides, marked by the admitting office with the date "8–11" and the letters of the child's last name and accompanied by a slip containing a request of "what they wanted us to look for," had been received by the bacteriological laboratory from the hospital admitting office in accordance with established hospital procedures. He then stated that his microscopic examination of the slides revealed sperm on the vaginal smear and that this information, as well as the written information previously on the slides and that contained in the accompanying slip, was placed on the slides in a non-erasable fashion. Dr. Mangum's and Bacteriologist Stone's testimony demonstrates that the procedures followed in this case were those regularly used by the hospital to make and keep a record of examinations of this kind.

Since Dr. Mangum was unable to say there had been sexual intercourse of the child about the time of the alleged assault, proof that she had been carnally assaulted rested substantially on the bacteriologist's testimony regarding the presence of sperm. That testimony, in turn, rested solely on the slides which were ultimately admitted in evidence over appellant's objection that they were not sufficiently identified by Dr. Mangum as those upon which he placed the smears taken from the child.

■■■ This objection is based upon appellant's view that the prosecution did not establish the necessary links in the chain of identification between Dr. Mangum's taking of the smears, their analysis by Bacteriologist Stone and their production in court. He refers us to Novak v. District of Columbia[4] as authority for his position. We think, however, that Novak is not controlling and that the slides in question are admissible under the federal Business Records Act.[5] That Act provides in pertinent part that:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, pro-

4. 1947, 82 U.S.App.D.C. 95, 160 F.2d 588.

5. 28 U.S.C. § 1732(a) (Supp.1952). The prosecution did not urge the applicability of § 1732(a) until we raised that question *sua sponte* after oral argument and ordered the parties to file supplemental briefs thereon. Until then, it had urged admissibility solely on the ground that all the necessary links in the chain of identification had been established from personal knowledge of the witnesses. It is unnecessary for us to consider that ground since we think the slides admissible under § 1732(a).

fession, occupation, and calling of every kind."

It makes admissible in all judicial proceedings, civil or criminal, records made in and pertaining to the regular course of business.[6] It does not require that the person testifying in respect of the records have personal knowledge of their contents.[7]

■ There is no doubt that these slides were made and kept in the regular course of business and that it was the hospital's regular course of business to make them. Nor is there any question that the Act embraces hospital records.[8] Under this and similar statutes, cardiograms, electroencephalograms, blood tests and clinical charts have been admitted as hospital records.[9] We see no distinction between these types of records and the slides in this case. All are admissible "because they represent routine reflections of day-to-day operations."[10] The recording of the data on the slide itself rather than on a separate sheet of paper gives still further assurance of accuracy. Any objections which appellant might have to Dr. Mangum's or Bacteriologist Stone's lack of personal knowledge of any of the steps from preparation of the slides to their production in court do not affect their admissibility

but go, instead, to the weight to be accorded them.

As indicated above, we think Novak is clearly distinguishable. In that case, a police officer testified he obtained a specimen of the accused's urine in a bottle which he labeled with the accused's name and his own initials and delivered to the Health Department laboratory. A Health Department chemist then testified concerning his urinalysis of a specimen which had been withdrawn from a bottle produced in court and labeled with the accused's name. We held that testimony inadmissible on the ground that there was "missing a necessary link in the chain of identification" because the police officer was not asked to identify the bottle produced in court to establish that it was the same one which he delivered to the laboratory and from which the chemist's analyzed specimen was taken. The key fact which distinguishes Novak from this case is that the specimen there was not taken in the regular course of business of the laboratory involved. Instead, it was taken by an outside agency, the police, and only thereafter delivered to the laboratory.

■ Next, we think it was not error to admit testimony by the child's grandmother—under the spontaneous exclamation exception to the hearsay rule [11]—

6. Illustrative of the broad scope which has been given the statute is Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1950, 183 F.2d 467, 472–473.

7. Landay v. United States, 6 Cir., 1939, 108 F.2d 698, 704–705, certiorari denied, 1940, 309 U.S. 681, 60 S.Ct. 721, 84 L. Ed. 1024; Doyle v. Chief Oil Co., 1944, 64 Cal.App.2d 284, 288–292, 148 P.2d 915, 918–920; Hyde v. Albert E. Peirce & Co., 1934, 147 Or. 5, 24, 31 P.2d 755, 762.

8. As we stated in New York Life Ins. Co. v. Taylor, 1945, on Rehearing, 79 U.S. App.D.C. 66, 72, 147 F.2d 297, 303, "Hospital records are no different from any other kind of records kept in the regular course of business." See also Ulm v. Moore-McCormack Lines, Inc., 2 Cir., 1940, 115 F.2d 492, certiorari denied, 1941, 313 U.S. 567, 61 S.Ct. 941, 85 L. Ed. 1525.

9. Cardiogram, Freedman v. Mutual Life Ins. Co., 1941, 342 Pa. 404, 414, 21 A. 2d 81, 86; electroencephalogram, Mayole v. B. Crystal & Son, Inc., 2 Dep't 1943, 266 App.Div. 1008, 44 N.Y.S.2d 411, 412; blood test, Wilson v. State, 1942, 243 Ala. 1, 17, 8 So.2d 422, 436–437; clinical charts, Gile v. Hudnutt, 1937, 279 Mich. 358, 361, 367, 272 N.W. 706, 707, 709. For general discussion as to types of medical records admissibile, see Comment, 46 Mich.L.Rev. 802, 806–07 (1948).

10. New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App.D.C. 66, 69, 147 F.2d 297, 300.

11. The court charged the jury that:
 "The law of the District of Columbia is that when a girl of tender years makes prompt report of an attack, by its spontaneity it may be received as part of what is termed the res gestae. The Latin words mean 'The thing speaks.' It

that she heard the child name the appellant as her assailant. The child made the statement under these circumstances. Within an hour, at most, after the attack was alleged to have occurred in appellant's home, the child left and went directly to her grandmother's home three blocks away. There was evidence that when she arrived she was highly distraught and in shock. The grandmother testified that the child was crying upon arrival and went into the bathroom where her mother was; that she (the grandmother) while standing "halfway in" the bathroom door heard her daughter (the child's mother) tell the child to "hush" her crying and "to tell her what was wrong"; that the child said, "Rodney [the appellant] just had something to do with me, and this isn't the first time, but I was scared to tell you."

It is clear enough from the circumstances of time in relation to the alleged offense, and the age and condition of the declarant that there was ample basis for holding the child's declaration "spontaneous" and admissible in evidence, as an exception to the hearsay rule, "as proof of the facts which they assert." This exception rests upon the sound premise that "[s]ince [the] utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy * * *."[12]

Since this premise is not affected by the declarant's later contradiction from the stand, it follows that the trustworthy character of the spontaneous declaration is likewise unaffected by the later contradiction. Moreover, both the declarant and the witness who claims to have heard the declaration are available for cross-examination, so that the jury may determine their credibility for the purpose of resolving the conflict in their testimony.

Appellant also contends that the trial court erred in ruling that, for the purpose of cross-examining and impeaching its own witness, the prosecution had "been taken by surprise" within the meaning of the statute providing in pertinent part that:

"Whenever the court shall be satisfied that the party producing a witness has been taken by surprise by the testimony of such witness, such party may, in the discretion of the court, be allowed to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to such party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause; * * *."[13]

The question arises in this context. Within a few hours after the alleged assault, the child signed a statement prepared by a policewoman from "the child's words" describing, in sordid detail, an assault upon her by appellant.

is sometimes referred to as a verbal act, being so associated in point of time and with the spontaneity as to be a part, says the law, of the act itself."

Although this charge makes reference to admission of this testimony as "part of what is termed the res gestae" or as "a verbal act," we think from the court's reliance on Beausoliel v. United States, 1939, 71 App.D.C. 111, 107 F.2d 292, that it intended to admit the testimony as a "spontaneous exclamation."

The statement is not a verbal act since it does not help give legal significance to an equivocal act. See 6 Wigmore, Evidence § 1772 (3d Ed. 1940).

"The phrase 'res gestae' has long been

not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated, as a vicious element in our legal phraseology. * * *" 6 Wigmore §. 1767.

12. 6 Wigmore § 1747.

13. D.C.Code § 14–104 (1951).

According to the prosecution's uncontradicted representation to the court, she repeated this charge to the indicting grand jury (presumably under oath) but some months later and about six weeks before trial, appellant showed the prosecution a statement, written by him and by the child's mother and purportedly signed by the child, completely exculpating him. In view of this later contradictory statement, the prosecution asked the court to call the child as its own witness so that it could cross-examine and impeach her in the event she repudiated her earlier accusatory statements. The court refused this request without explanation. The prosecution then called the child as its own witness and when she actually contradicted these earlier statements, the court upheld a prosecution claim of "surprise" under the above quoted statute and exercised its discretion thereunder to permit cross-examination and impeachment.

 Maintaining that the prosecution was not "taken by surprise," appellant argues that, under the statute, the court was precluded from permitting cross-examination and impeachment of the child. The statute merely codifies the established rule concerning the impeachment of one's own witness [14] and allows ample latitude for application of a broad concept of "surprise" by requiring only that "the court shall be satisfied" that "surprise" exists. In terms of our review, this means that the trial court's ruling on "surprise" may not be disturbed unless it plainly appears that the ruling is without any rational basis.

 The child's unequivocal statement to the police on the heels of the alleged event was made before opportunity for reflection and was confirmed by her testimony under oath before the grand jury after opportunity for reflection. The later and contradictory statement, purportedly signed by the child, was made after she and her mother, who had ceased living with appellant after the alleged assault, resumed living with him and were subject to his influence. From these circumstances, we do not think it was incumbent upon the prosecution to believe that once the child was placed under oath on the witness stand and removed from the influence of the accused, she would contradict both her first statement, given immediately after the alleged crime, and her subsequent testimony before the grand jury. The prosecution could reasonably have expected the threatened contradiction to dissolve in the atmosphere of the witness stand.[15] Thus, when it did not dissolve. there was a rational basis for the trial court's being satisfied that the prosecution had "been taken by surprise" within the meaning of the statute.

 Nor can we agree with appellant's further contention that even if the written statement to the police was admissible for impeachment purposes only, the court erred in permitting the

---

14. Smith v. United States, 1927, 57 App. D.C. 71, 72, 17 F.2d 223, 224.

15. As stated in United States v. Graham, "As matters turned out, it became plain enough that the witness had told the assistant district attorney and others before he was called to the stand that he had testified falsely before and would not do so again. It was known, therefore, that he would not be a willing witness. But we see no reason why the district attorney should not have been privileged to believe that when the witness was actually required to testify under oath he would again tell what the attorney believed to be the truth as he had testified before notwithstanding his attempt to dissuade the attorney from calling him again. * * * It was one thing to threaten not to testify and quite another to carry out the threat when actually put to the test. * * *" 2 Cir., 1939, 102 F.2d 436, 442, certiorari denied, 1939, 307 U.S. 643, 59 S.Ct. 1041, 83 L. Ed. 1524. For similar views about "surprise," see also London Guarantee & Accident Co. v. Woelfle, 8 Cir., 1936, 83 F. 2d 325, and cases cited therein; and Ellis v. United States, 8 Cir., 1943, 138 F. 2d 612, 616. But see Young v. United States, 5 Cir., 1938, 97 F.2d 200, distinguishable on its facts from the present case, for expression of a view which we think unduly limits the right to claim "surprise."

prosecution to read the statement *in toto*.[16] We recognize, of course, that despite the court's careful admonitions as to the statement's limited purpose, in instructing the jury,[17] the "possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real * * *."[18] This danger cannot always be obviated or even lessened by requiring the trial court to limit cross-examination so that only the general nature of the earlier statement, and not its specific details, will be made known to the jury. For while there may well be instances where it would be desirable for the trial court to admit only a portion of the impeaching statement, there may also be others where most or all of the specific details of the earlier statement are essential to appraise the contradiction uttered from the witness stand. For this reason we have held that in cases like the present "the latitude to be allowed in the cross-examination of the witness is within the discretion of the trial justice." [19] We are unable to say that the latitude allowed here constituted an abuse of that discretion.

■ Appellant also complains of the prosecutor's use of the statement in his closing argument. That the prosecution attempted to influence the jury to use it substantively is clear; and certainly this practice is to be condemned. But in light of the court's charge, in which the jury was soundly and clearly instructed as to the permissible use of the statement, and the failure of defense counsel to object to any part of the argument, we do not think the court committed reversible error in not raising the point *sua sponte*. After all, the prosecutor was entitled to make use of the statement in arguing the issue of the credibility of the child's testimony.

■ Finally, one other matter deserves comment. Defense counsel read certain instructions to the jury which was later ordered by the court to "observe them as though the court himself had given these instructions to you, direct." This subsequent judicial adoption of defense counsel's instructions does not save the practice of having instructions read by counsel from running afoul of the unambiguous direction of Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C., that "the court shall instruct the jury after the arguments are completed."[20] This error was not preju-

---

16. This, it is said, is particularly true since the statement, highly harmful to appellant, was prepared by a policewoman and signed by the child without reading it at a time when she was too distraught to know what she was doing. Neither the circumstances of the signing nor the inflammatory nature of its contents provides a bar to admission for impeachment purposes only. Such matters are merely a part of the complex of circumstances which the jury may consider in determining the impeaching effect, if any, of the earlier statement upon the credibility of the testimony uttered from the stand.

17. The court, at the time of the statement's admission, did not instruct the jury that the statement was to be used only for impeachment purposes. Such an instruction at that time, as well as in the charge, would certainly have been desirable. But considering the circumstances—especially the failure of defense counsel to request such an instruction—

we do not think its omission was reversible error.

18. DiCarlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368, certiorari denied, 1925, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168. And, for support of the proposition that such prior inconsistent statements should, if verified, be given substantive weight, see McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Texas L.Rev. 573, 578–79, 588 (1947).

19. Bedell v. United States, 1934, 63 App. D.C. 31, 32, 68 F.2d 776, 777; to the same effect is Smith v. United States, 1927, 57 App.D.C. 71, 72, 17 F.2d 223, 224.

20. While this rule was still in draft stage, we had occasion in Copeland v. United States, 1945, 80 U.S.App.D.C. 308, 152 F.2d 769, certiorari denied, 1946, 328 U. S. 841, 66 S.Ct. 1010, 90 L.Ed. 1815; and in Medley v. United States, 81 U.S. App.D.C. 85, 155 F.2d 857, certiorari

dicial in the circumstances of this case. But we take this occasion to make clear the necessity for putting an end to the practice in question.

Upon careful consideration of all the other grounds urged for reversal, we find them without sufficient merit to warrant discussion.

Affirmed.

FAHY, Circuit Judge (dissenting).

I agree with the majority opinion in all respects save one, that is, the disposition it makes of the use of the child's written statement to the police. As pointed out in the opinion the prosecution was entitled to take refuge in the "surprise" rule in order to cross-examine the child and to use her written statement to contradict her denial on the stand that defendant had abused her. Certainly the jury were entitled to know fully that she had made a prior inconsistent statement, though I have some question whether the whole statement in all its sordid details was admissible. See 6 Wigmore, Evidence § 1904 (3d Ed.). Laying aside, however, my doubts on this score, I think it was in any event reversible error to allow the prosecution to use the statement not merely for impeachment purposes, to which it is confined by our Code, § 14–104, but as sub-stantive proof of the truth of its contents. It purported to describe in great detail the events which occurred. It was hearsay evidence as to those events and was not admissible to prove them under any exception to the rules excluding hearsay.[1] True, the court admonished the jury that the statement was to be considered only on the question of the credibility of the child; but the use made of it, particularly in the closing argument of the prosecuting attorney, was by no means so limited. It was used explicitly as evidence of the truth of its contents. It does not seem to me that Smith v. United States, 57 App.D.C. 71, 17 F.2d 223, Bedell v. United States, 63 App.D.C. 31, 68 F.2d 776, or Di Carlo v. United States, 2 Cir., 6 F.2d 364, certiorari denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168, supports such use. The situation is more akin to the abuse condemned in Rosenthal v. United States, 8 Cir., 248 F. 684, referred to in the Di Carlo opinion. While the statement was admissible to impeach the child notwithstanding its incidental evidentiary effect beyond that, when it was expressly used as substantive evidence against the defendant the consequence was no longer incidental. It was then, I think, erroneously used for a purpose for which it was inadmissible. This we should not countenance.

denied, 1946, 328 U.S. 873, 66 S.Ct. 1377, 90 L.Ed. 1642, to express our reasons for disapproval of the practice of allowing counsel to read instructions and to call attention to the fact that the practice would be forbidden under the rule.

1. Wigmore, while recognizing this as the settled rule of the courts, and admitting that it was his expressed view in an earlier edition, nevertheless rejects this application of the hearsay rule as unsound. 3

Wigmore, Evidence § 1018(b) (3d Ed.). His reasoning is that the rule excludes extrajudicial statements because made out of court by an absent person not subject to cross-examination to test the basis for the former statement; whereas in such a situation as we have here the witness is present and subject to cross-examination. Even were we persuaded by this later view of Wigmore our Code would not permit its adoption.