Submitted on briefs December 18, 1935; affirmed February 18, 1936.

DOWNS ET AL. *v.* NATIONAL SHARE CORPORA-
TION ET AL.

(55 P. (2d) 27)

*George D. La Roche,* of Portland, for appellants.

*Vernon J. Veron* and *Fred W. Bronn,* both of Portland, for respondents.

ROSSMAN, J. The plaintiff Samuel U. Downs, 80 years of age at the time of the trial June 1, 1934, had been principal of a Portland grammar school for 46 years. At the time of the trial he was retired. His daughter, Mabel Downs, the other plaintiff, was a teacher in a Portland high school. Each of them had accumulated a modest competency which was invested in bonds and preferred stocks. In December, 1930, the defendant Graham, a salesman of stocks and bonds, called upon the plaintiffs and urged them to purchase some of the common stock of the defendant National Share Corporation. At the same time he asked them to give him a list of securities which they owned, stating that he would send the list to San Francisco for appraisal. A list was given to him. He called again on December 22, 1930, at which time Miss Downs purchased 10 shares of the common stock of the National Share Corporation, and, jointly with her father, purchased an additional 40 shares of the same stock at $25 per share. The plaintiffs in payment handed to Graham no cash, but delivered to him such of the securities mentioned in their list as he stated were acceptable. On September 28, 1931, Graham induced the father to purchase 140 shares of the same stock and his daughter to purchase 92 shares. The price again

was $25 per share. Immediately prior to this transaction the plaintiffs, as at the time of the previous purchase, had delivered to Graham a list of securities they owned. Some of these securities were accepted as payment for the new purchases.

The complaint alleges that Blanchard made the following representations in order to induce the plaintiffs to make their purchases, and that they relied upon them: (1) That the National Share Corporation "was a good, safe and reliable corporation dealing in securities listed on the New York Stock Exchange"; (2) that the shares of the capital stock of that corporation "were readily and easily marketable"; (3) that that corporation, as well as the other two defendants, would promptly redeem, at $25 per share, any of the stock which the plaintiffs purchased. At the time of the trial the plaintiffs were permitted to amend their complaint by adding the following averment: ". . . and when said stock was so sold said defendants were not nor either of them licensed or authorized as by law required to sell said stock." The complaint, in alleging the manner in which the representations were made, states the relationship of each of the three defendants to each other in the following language: "The defendant National Share Corporation, a corporation, by and through its agents, representatives and officers, the Blanchard Securities Corporation, a corporation, by and through its agents, representatives and officers, and E. H. Graham, and each of them, being desirous of making a sale to said plaintiffs of shares . . . ." The complaint alleges that, in reliance upon these representations, the plaintiffs purchased the aforementioned stock, "paying the sum of $25 a share". It avers that the above representations were untrue and that, although the plaintiffs demanded that the de-

fendants redeem the stock, the defendants failed to do so. In each cause of action the plaintiffs aver they were damaged to the extent of the stock purchased at the rate of $25 per share. The two corporations filed a joint answer and Graham filed his individual answer. The answers deny the averments of fraud, agency, damage and payment. During the course of the trial the answers were amended by inserting the following averment: "On the 8th day of April, 1932, the plaintiff, Mabel Downs, accepted an agreement in writing from E. H. Graham in which she agreed to return or sell the stock concerning which she is suing in this action, and accepted a contract for the price thereof and by so doing waived any fraud." The evidence offered by the plaintiffs is uncontroverted.

The appellants contend that the complaint fails to state a cause of action, that the averment of agency is insufficient to have permitted the introduction of evidence showing the relationship of the defendants to each other, that the evidence failed to substantiate the averments of the complaint, that the evidence failed to prove that Graham was the agent of the other two defendants, and that the evidence disclosed no damage.

The National Share Corporation was organized under the laws of Delaware. One R. A. Blanchard was its president, and an individual named L. R. McGee was its secretary. The business in which the company was engaged was speculation in securities listed upon the New York Stock Exchange. So far as is disclosed by the record, the concern was engaged in business only in Portland and San Francisco. At the same time there existed another corporation, the defendant Blanchard Securities Corporation, an Oregon corporation. The aforementioned Blanchard was also

the president of that corporation, and the aforementioned McGee was its secretary. The Blanchard Securities Corporation was authorized by its articles of incorporation to act as broker in the sale of corporate stock. June 10, 1930, it applied to the corporation commissioner of this state for a permit to sell as dealer 2,000 shares of the capital stock of the National Share Corporation at a price of $25 per share. A part of the application was a financial statement of the National Share Corporation which showed that its assets consisted of $6,500 cash, prepaid expenses amounting to $1,000, and two apartment houses located in the state of California worth $100,000. Its sole liabilities were its outstanding stock. August 13, 1930, the commissioner granted the desired permit in an order which stated that he acted in reliance upon the truthfulness of the application. July 6, 1931, the commissioner, upon discovering that the corporation had no interest whatever in the apartment houses mentioned in the application, cancelled its permit. Thus, the permit was in effect for the period of August 13, 1930, to July 6, 1931, being approximately 11 months. According to the records of the corporation commissioner, the defendant Graham was registered as an agent of the Blanchard company in the period of April 28, 1931, to June 30, 1931. Thus, at the time when the aforementioned transactions were consummated with the plaintiffs Graham lacked a permit, and the Blanchard company possessed one only when the transactions of December 22, 1930, consisting of the sale of 50 shares, was consummated, but possessed none September 28, 1931, when the plaintiffs bought 232 shares.

██ We shall first consider defendants' contention that the allegation of agency was insufficient. The sufficiency of the complaint was not tested by motion or

demurrer. It will be observed that an act done through an agent may be averred in any one of three ways: (1) it may be described as the act of a principal without mention of the agency; (2) it may be described as the act of the agent performed on behalf of the principal; or (3) it may be described as the act of the principal performed through the instrumentality of an agent. The defendants seem to believe that the complaint should have averred the agency in greater detail and that the averment should have been accompanied with a statement that Graham was acting within the scope of his authority. In *Davis v. Houghtellin,* 33 Neb. 582 (50 N. W. 765, 14 L. R. A. 737), the court held that the following language ''was acting for said defendants in the due course of his employment as aforesaid and pursuant to his instructions and orders'' was '' a mere conclusion, and not a statement of any fact''. In *Partridge v. Badger,* 25 Barbour 146, the court said: ''The allegation in the complaint, that the drafts were accepted by the company by their treasurer, includes an averment of authority to the treasurer to accept the drafts, as the company could not accept by him unless he had such authority. . . . What is necessarily understood or implied in a pleading forms part of it, as much as if it was expressed.'' In *Duvall Investment Co. v. Stockton,* 54 Fla. 296 (45 So. 497), the court held that since a corporation acts only through its agents, an averment of the name and particular authority of the agent is generally unnecessary. From *McAdow v. Kansas City Western Railway,* 100 Kans. 309 (164 P. 177, L. R. A. 1917 E, 539), we quote: ''The usual form of averment, that the contract was made by defendant's duly authorized agent, or words of like import, must be held sufficient to sustain evidence of any appropriate manner of authorization

short, at least, of estoppel." In *Kjerschow v. Daggs,*
24 Ariz. 207 (207 P. 1089), the court held that an
allegation that John Christy "acting for himself and
as the agent and representative of the defendants"
was sufficient to authorize proof of his representative
capacity. In this state a general allegation of agency is
sufficient: *L. B. Menefee Lumber Company v. Mac-
Donald,* 122 Or. 579 (260 P. 444); *Interior Warehouse
Co. v. Dunn,* 80 Or. 528 (157 P. 806); *Kitchen v. Holmes,*
42 Or. 252 (70 P. 830). A collection of citations appears
in Pomeroy's Code Remedies (5th Ed.) p. 775 (note).
See also 2 C. J., Agency, p. 905, § 611, and Phillips on
Code Pleading, § 346. We believe that the challenged
averment was sufficient.

■ Next, the appellants argue that the record con-
tains no evidence showing that Graham was the agent of
either of these appellants. It is true that the evidence
in support of the averments of agency is somewhat
scattered. Nevertheless, the defendants offered no
evidence whatever, and the court entered a finding
which states that at the time Graham dealt with the
plaintiffs he "was acting as the agent of said defendant
Blanchard Securities Corporation, and said defendant
Blanchard Securities Corporation was acting as the
broker for said defendant, National Share Corpora-
tion, for the sale of said class A stock of said defend-
ant, National Share Corporation. . . ." It will be
recalled that the securities involved in this action are
shares of the common stock of the defendant National
Share Corporation. The shares which the plaintiffs
purchased were original issues; that is, the stock had
never been issued before. The permit held by the
Blanchard Securities Corporation was issued to it as
a dealer, and, apparently, it was contemplated that
it should own the shares which it was authorized to

sell. See § 25-1301, Subd. (b), Oregon Code 1930. Nevertheless, the proof shows that the stock which the plaintiffs acquired was original stock. It is, therefore, evident that Graham was not selling stock which he owned, and that in these transactions he was representing someone else. This inference is sustained by the proof. Referring to Graham, the plaintiff Mabel Downs was asked: "Did he ever tell you that the stock that he sold you belonged to anybody else?" She answered: "Well, that was it all the time; it was not his stock." The proof makes it clear that Graham could not have represented anyone except one or both of the two corporate defendants, one of which was the issuer of this stock and the other was the dealer. Affording a clue to the identity of Graham's principal is the circumstance that he sent the plaintiffs' lists of securities to San Francisco where the defendant National Share Corporation apparently had its headquarters, stating that he would obtain an appraisal and also determine whether any of the securities would be acceptable in the purchase of the stock which he was offering for sale. It will be recalled that Mr. Blanchard was the president of both of the corporate defendants. After the transaction had been concluded the plaintiff Samuel Downs had a conversation with Mr. Blanchard, regarding which he was asked "Did he ever deny to, you that Graham was representing National Share Corporation or Blanchard Securities Corporation?" and replied, "No." About the same time Mr. Vernon J. Veron, attorney for the plaintiffs, also had a conversation with Mr. Blanchard, and, as a witness, related a part of the conversation, thus: "I specifically asked Mr. Blanchard whether or not Graham represented Blanchard Securities Corporation and he said he did on both of these sales." It is conceded that as a result of their

transactions with Graham the appropriate stock certificates were issued by the National Share Corporation to the plaintiffs. It is also conceded that dividends for a short time were paid to the plaintiffs by the same corporate defendant. Prior to the payment of the dividends, dividend notices upon the stationery of the National Share Corporation were mailed to the plaintiffs. In the conversation which Mr. Veron had with Blanchard the latter, referring to the securities which the plaintiffs had delivered to Graham, stated: "We still have some of them." In other words, they still had some of the consideration which the plaintiffs paid for the stock which they purchased. In our opinion, these circumstances warrant a conclusion that Graham was in the employ of the Blanchard Securities Corporation as an agent at the time these transactions were consummated, and that the latter was the agent of the National Share Corporation for the purpose of selling 2,000 shares of its corporate stock. We have arrived at this conclusion notwithstanding the fact that the Blanchard Securities Corporation's permit was to sell the stock as a dealer. Section 25-1301, Oregon Code 1930, defines the term "dealer" as any person, other than an agent or broker, who is engaged in the business of selling "securities issued by such dealer". The Blanchard company was not selling stock issued by itself for it never owned this stock. It was, in fact, nothing more than a broker and, manifestly, had obtained the wrong sort of permit.

It will be observed from the facts stated above that September 28, 1931, when the defendants sold the plaintiffs 232 shares of the capital stock of the defendant National Share Corporation, the defendants had no permit or license of any kind. The corporation last named was a foreign corporation and was not domiciled

in this state. It neither sought nor possessed any kind of permit. The permit which the defendant Blanchard Securities Corporation obtained on August 13, 1930, was cancelled about three months before the plaintiffs made their purchases on September 28, 1931; and Graham's last license as an agent expired on June 30, 1931. Section 25-1302, Oregon Code 1930, provides:

"No sale, negotiation, or offer for sale, of any security or securities, or the solicitation of others to purchase such securities, shall be made in the state of Oregon until permit authorizing the selling thereof shall have been issued by the corporation commissioner. . . ."

Section 25-1313, Oregon Code 1930, provides:

"Any dealer or broker may appoint one or more agents, but no such agent shall do any business for said dealer or broker in this state until he shall first register with the corporation commissioner as agent for such dealer or broker. . . . Such registration shall entitle such agent to represent said dealer or broker as its agent until the first day of July following, when it shall be necessary to re-register such agent."

The purpose of these statutes in requiring a license is manifestly for police regulation and the protection of the public; therefore, sales by unlicensed persons or corporations are void: *Salo v. Northern Savings & Loan Ass'n*, 140 Or. 351 (12 P. (2d) 765); *Pennicard v. Coe*, 124 Or. 423 (263 P. 920); *Moe v. Coe*, 124 Or. 436 (263 P. 925); and *Bond v. Coe*, 124 Or. 440 (263 P. 924). From the decision first cited, we quote:

"All who participated in bringing about the consummation of such sale are liable for the damages resulting from such unlawful act."

See to like effect *Hyde v. Peirce & Co.*, 147 Or. 5 (31 P. (2d) 755); *Drees v. Minnesota Petroleum Co.*,

189 Minn. 608 (250 N. W. 563). A citation to numerous other decisions holding void sales of securities consummated in violation of blue sky statutes may be found in Fletcher Cyclopedia Corporations, Permanent Edition, § 6763, and annotation in 87 A. L. R. 98.

■ It follows from the conditions mentioned in the preceding paragraph that plaintiffs possessed good causes of action arising out of defendants' illegal sales of September 28, 1931. In *Salo v. Northern Savings & Loan Ass'n,* supra, the plaintiff sought the recovery from his vendor of sums paid by the plaintiff in the purchase of corporate stock, charging (1) fraud, and (2) vendor's violation of the blue sky statute's requirement of a dealer's license. A judgment in favor of the plaintiff was affirmed by this court, regardless of the charges of fraud, when the uncontradicted evidence showed that the vendor corporation lacked a license authorizing it to sell the stock. Therefore, since the defendants possessed no license September 28, 1931, when they sold to the plaintiffs 232 shares of this stock, we have a precedent which holds that the form of action chosen by these plaintiffs is proper to sustain the circuit court's judgment, regardless of the conditions of the proof concerning the charges of fraud.

■ The appellants criticize the averment concerning the lack of licenses. We believe that the averment is in proper form: *Pennebaker v. Kimble,* 126 Or. 317 (269 P. 981).

■ So far we have proceeded as though the plaintiffs' charges of fraud were unproven, but we believe that the circuit court's findings in support of these charges are supported by substantial, competent evidence. The evidence indicates that Graham represented to the plaintiffs that the stock which he urged them to buy was ''as safe as any investment possibly could be''.

He stated to the plaintiffs that the National Share Corporation possessed a fund "which would absorb any losses that might be incurred". He commented upon "the assurance of security owing to the fact that a cushion fund, was established and held in trust to cover any possible loss that the company might incur, owing to the fact that it was dealing on a stock market. . . . It was to the effect that there was established at a definite point, I don't know, in the East, a fund which would absorb any losses that might be incurred and would pay in full the value of the share which was represented". To Mabel Downs he referred to this "fund" as a "sinking fund", and stated that it would assure regular payment of dividends. He told the plaintiff Samuel Downs that this stock was "one of the safest stocks in creation" and "assured me on every meeting that I had with him that it was very dependable stock". While these representations were being made, the plaintiffs inquired of Graham whether they could readily dispose of any stock that they might purchase in the National Share Corporation, stating that they did not care to make a purchase unless they could easily get back their purchase price in case of necessity. Graham assured them that the National Share Corporation would promptly repurchase their stock at any time they wished to convert it into cash. According to Miss Downs, "He said, 'Well, there is no trouble about that;' he says: 'We are buying and selling all the time and if you want to dispose of these,' —he didn't even suggest that I dispose of them myself; he said: 'We will have no trouble at all in getting the money for you.' " A witness who overheard one of the conversations related it thus: "She tried to impress him with the fact that she wanted to be sure to put her money into something where she knew she

could get it out if she needed it, and he assured her very strongly, very firmly, that at any time, giving a reasonable notice, she could get her money . . . the company would absorb the share and pay her the face value of the stock.'' According to Mr. Downs, Graham assured him that ''at any time we wished to get the money out of it, we could do so''. A prospectus published by the National Share Corporation states: ''Marketability: In addition to a ready market for the Class 'A' Common Stock which the distributors expect to maintain at all times, the Board of Directors has adopted the policy of repurchasing, in its discretion, out of surplus, any stock offered at the net liquidating value per share, less 2%.'' Mr. Veron, the witness previously mentioned, testified that in his conference with Mr. Blanchard, ''I was discussing with him the representations made by my clients as to being able to get their money out of it, and I asked him, I said: 'Here, what about this; these people say thus and thus;' and he said: 'That is true; Graham was supposed to make that representation;' that we have it in our prospectus.''

■ The appellants contend that Graham's statement concerning the safety of the investment which he was submitting for purchase was a mere expression of opinion and was, therefore, not actionable. In *Hyde v. Peirce & Co.*, supra, where a similar proposition was before us, we quote the following from *Boelk v. Nolan*, 56 Or. 229 (107 P. 689):

''A matter of opinion may amount to an affirmation of fact, when the parties are not dealing upon equal terms, and one of them has, or is presumed to have means of information not equally open to the others.''

In this instance, the salesman talked about ''a sinking fund'' and ''a cushion'' which would prevent

losses and assure profits. The company's financial statement, forming a part of the application of the Blanchard Securities Corporation for a permit, discloses no sinking fund. In fact, when the fictitious asset of $100,000 invested in California apartment houses is stricken, a deficit of $92,500 is revealed. It is our belief that Graham's representations concerning the safety of this investment was not a mere expression of opinion. It can readily be construed as a representation that he knew facts which justified his opinion. The fact that Graham's statement produced conviction in the minds of the plaintiffs is proved by the fact that, although the plaintiffs turned over to him virtually their entire savings, they consulted no one except Graham. For instance, when Mr. Downs was asked whether he made any effort to inform himself concerning the value of the National Share Corporation stock, he replied: "I am not businessman enough to know how to go to work to do that; I didn't make any such effort at all." Under the facts before us this representation concerning the safety of the investment was actionable.

We believe that competent, substantial evidence indicates that the aforementioned representations were not only made but that they were untrue. As shown in the preceding paragraph, the corporation maintained no sinking fund. Graham represented that the sinking fund upon which he repeatedly commented was available, not only for the payment of dividends but also for the repurchase of stock. The plaintiffs sought repeatedly to have their stock repurchased, but no repurchases were made. They were told to come again, and also that a reorganization was in contemplation. R. F. Pelouze, local manager of A. E. Fitkin & Sons, Inc., security dealers, and T. Henry Boyd, local manager of Blythe & Company, security dealers, testified

that they knew of no market for the stock of the National Share Corporation, and that, although they had examined various market reports which record the daily sales of securities, they had found no report showing a sale or a purchase of this stock; in fact, they swore that they had not even found an offer for its purchase. Appellants now argue that this testimony was inadmissible because the witnesses did not bring with them the market reports. That objection, however, was not made in the circuit court and, hence, will be ignored here. False representations that an article offered for sale will be repurchased or that it is readily marketable, made for the purpose of inducing a purchase, are actionable: *Richer v. Burke,* 147 Or. 465 (34 P. (2d) 317); *Hyde v. Peirce & Co.,* 147 Or. 5 (31 P. (2d) 755); *Burgess v. Charles A. Wing Agency,* 139 Or. 614 (11 P. (2d) 811); *Sharkey v. Burlingame Co.,* 131 Or. 185 (282 P. 546). We, therefore, conclude that the representations which induced this purchase were actionable.

■ The appellants argue that the doctrine of *caveat emptor* is applicable to the transactions mentioned in the complaint. The tendency of modern decisions is to restrict that doctrine and to condemn the fraudulent party rather than his victim. We can not say that the plaintiffs failed to exercise reasonable diligence. The operations of the New York Stock Exchange and the character of a concern which proposes to operate there are subject matters difficult of investigation. The important items are that Graham made false representations, and that these plaintiffs, schooled in abstract knowledge but lacking practical experience, were deceived.

■ The appellants argue that the damages awarded have not been proven. The circuit court allowed as

damages the sums paid by the plaintiffs for the 232 shares. The appellants seem to believe that the evidence fails to disclose that the stock was valueless. It will be recalled that when the defendants sold to the plaintiffs 232 shares of this stock on September 28, 1931, they had no permit of any kind authorizing them to negotiate that transaction, and that the transaction was, therefore, void. Hence, it is evident that the plaintiffs have a good ground for the recovery of the sums paid for those shares. But we believe that, apart from that circumstance, the evidence shows that all of the stock was valueless. The two witnesses already mentioned knew of no market for it, and the defendants refused to repurchase it. Moreover, the financial statement of the National Share Corporation, as already indicated, shows a very large deficit when the fictitious asset of $100,000 is stricken. A demand for a financial statement made by the plaintiffs, when they were importuning the defendants to repurchase their stock, was denied. We believe that these facts support the circuit court's finding that the plaintiffs were damaged to the extent of the sums paid by them for this stock.

■ The appellants call attention to the fact that the plaintiffs received some dividends upon the stock, and argue that the appellants should be credited for the sums thus paid. The amount of these dividends is not disclosed. If the defendants wanted credit for these dividends they should have plead and proved the sums paid: Pomeroy's Code Remedies (5th Ed.), § 570.

■ The appellants argue that since the plaintiffs alleged that they paid for the stock at the rate "of $25 a share" no evidence of payment was admissible except evidence of cash payment, and that, therefore, the circuit court erred when it permitted the plaintiffs to show that they delivered to Graham securities upon

which a value of $7,050 was reported by him. No such objection was made in the circuit court. The testimony is readily susceptible of a construction that the defendants intended to convert the securities with which the plaintiffs parted into cash at once, and apply the latter in payment of plaintiffs' purchases. In that event, payment was made with cash: *Klatt v. Columbia Casualty Co.*, 213 Wis. 12 (250 N. W. 825). But, if such a construction is not permissible, a mere variance, in the absence of appropriate objections, avails the appellants nothing unless such a variance amounts to a failure of proof: Section 1-901, Oregon Code 1930. We do not believe that there exists a failure of proof.

It will be recalled that during the course of the trial the appellants amended their answer by incorporating in it an averment that April 8, 1932, the plaintiff Mabel Downs "accepted an agreement in writing from E. H. Graham" whereby she resold to him her stock. The document upon which appellants rely reads as follows:

"Portland, Oreg., April 8, 1932.

I have represented to Miss Mabel Downs that on May 1st, 1932 or before her shares in The National Share Corp. may be cashed in for the amount she paid for the same, $2550.00.

E. H. Graham."

This document does not support appellants' contentions.

We have carefully considered all other matters argued in the brief of the appellants, but have found no merit in them. It follows from the above that the judgments of the circuit court will be affirmed.

KELLY, BELT and BEAN, JJ., concur.

CAMPBELL, C. J., BAILEY and RAND, JJ., concur in the result.