**In re JUNE S. JONES CO., Debtor.**

**Civ. No. 84–0244.**

United States Bankruptcy Court,
D. Oregon.

Sept. 6, 1985.

Michael E. Don, Washington, D.C., for the Securities Investor Protection Corporation.

Peter Jarvis, Portland, Or., for trustee.

Kim T. Buckley, Portland, Or., for claimants.

## MEMORANDUM OPINION GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT (CLAIMS OF ORR, NOWLIN, HANNON, E. SANTUCCI, D. SANTUCCI, J. SANTUCCI, COTTON, MERCIER)

ELIZABETH L. PERRIS, Bankruptcy Judge.

In this case under the Securities Investor Protection Act ("SIPA" or "the Act"),[1] the liquidation trustee of June S. Jones Co. ("Debtor") determined that claimants[2] are entitled to securities in satisfaction of their claims. Claimants objected to the trustee's determination, arguing that they are entitled to cash, not securities. The parties filed cross-motions for summary judgment. On March 4, 1985, the Court in an oral ruling granted the trustee's motion, denied claimants' motion, and denied claimants' objection to the trustee's determination. This Memorandum Opinion will memorialize the Court's oral ruling.

### FACTS

Between December, 1983 and March 16, 1984, claimants made cash deposits with the Debtor for the purchase of shares of MSM Marketing, Ltd. ("MSM"). At the time of each trade, the Debtor had sufficient shares of MSM on hand to fill the purchase order. Shortly after each purchase, the Debtor would send confirmation of the purchase to both claimant and seller and would make appropriate changes in its stock records to reflect the change in ownership.

1. 15 U.S.C. §§ 78aaa–78lll (1982). All statutory references are to 15 U.S.C. unless otherwise noted.

2. The claimants and claims involved are: Robert L. Orr, Claim No. 1117; Virginia Nowlin, Claim No. 243; Dale and Molly Hannon, Claim No. 1116; Elsie C. Santucci, Claim No. 1119; Dorothy D. Santucci, Claim No. 1118; Joseph C. Santucci, Claim No. 1120; Ralph L. Cotton, Claim No. 1115; and Charles Mercier, Claim No. 423.

The actual transfer of the shares did not proceed as smoothly. MSM, a corporation chartered in the Province of Ontario, Canada, was traded through the Canadian stock exchanges located in the Provinces of Ontario and Alberta. On November 4, 1983, the Ontario Securities Commission entered a cease trading order against MSM. The Alberta Securities Commission followed suit on December 16, 1983. On May 3, 1984, the Alberta Securities Commission reinstated trading in MSM shares.

SIPC filed this case on June 4, 1984. On May 31, 1984, the Debtor had mailed to MSM's transfer agent sufficient MSM shares to cover claimants' purchases, along with instructions directing the transfer agent to redeem the shares and reissue new certificates in claimants' names. The transfer agent initially refused to make the transfer because of the cease trading order (which had, in fact, terminated in Alberta) and, on June 21 and July 12, 1984, the transfer agent returned the sellers' certificates. Between July 12, and July 31, 1984, the trustee re-sent the sellers' certificates to MSM's transfer agent. The transfer agent was prepared to accomplish the transfer through its Alberta office, but required further information. On August 1, 1984, the transfer agent again returned the sellers' certificates. The trustee provided the requested information and returned the certificates to the transfer agent who then transferred the shares on MSM's books. On September 14, 1984, new certificates were issued in claimants' names.

## ISSUE

Did claimants' accounts with the Debtor contain cash or securities as of June 4, 1984, the date on which the Securities Investor Protection Corporation ("SIPC") filed this case against the Debtor.

## ANALYSIS

A. *If Claimants Have A Claim For Customer Name Securities, They Are Entitled To Securities, Not Cash.*

█ Section 78fff–2(c)(2) provides in part that "[t]he trustee shall deliver customer name securities to or on behalf of a customer of the debtor entitled thereto ...". "Customer Name Securities" are defined in § 78*lll*(3) as

"... securities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor, but does not include securities registered in the name of the customer which, by endorsement or otherwise, were in negotiable form."

The claimants argue, first, that no securities were being held for their accounts on the filing date; and second, that the securities were neither registered nor in the process of being registered in their names on the filing date. As to the first issue, claimants assert that in order for securities to be "held for the account of a customer," specific shares of stock, identified either by number or some other method of allocation, must be assigned to the customer's account. In this case, debtor noted in its records only that, of the 593,000 MSM shares in debtor's possession, a specific number of MSM shares, but not the specific shares, were credited to each claimant's account. Claimants argue that this designation is not sufficient. The trustee argues that the initial allocation of a number of shares to each account did suffice to meet the "held for the account of a customer" requirement, but that even if it did not, the mailing of specific certificates to MSM's transfer agent, with instructions to redeem, and reissue new certificates in each claimant's name, satisfied the condition that the securities "were in the process of being registered."

The requirement that the securities were in the process of being registered should be liberally construed to effectuate the purpose of SIPA and the mandate that customers whose accounts should contain securities are to be provided securities. Claim-

ants argue that the registration effort terminated because the securities were initially sent to the wrong exchange and thus returned. This is too technical and narrow an interpretation of the statute. The Court finds that the mailing of the certificates for reissuance satisfied the condition that the securities be in the process of being registered.

The Court further finds that the process whereby the Debtor credited each claimant's account with the number of shares purchased and sent confirmation of the purchases while holding a sufficient number of shares to satisfy the sales, meets the requirement that the Debtor held securities for the accounts of the claimants on the filing date. Accordingly, the shares involved were customer name securities and the trustee could, and in fact was required under § 78fff–2(c)(2) to turn over the shares of stock to the claimants in order to satisfy their claims.

B. *Even If The MSM Shares Were Not Customer Name Securities, The Trustee Could Satisfy The Claims By Transferring To Claimants Securities In The Amount Purchased.*

SIPA distinguishes between net equity claims for cash and net equity claims for securities. Net equity claims for cash are to be satisfied by payment of cash to the customer. § 78fff–2(b)(1). Net equity claims for securities may be satisfied either by paying the customer in cash the value of the stock as of the filing date, or by transferring to the customer stock of the same class and series as that owed. § 78fff–2(b)(2). In the latter case, the stock is acquired either from the Debtor's inventory or, if necessary, by purchase from outside sources, provided that the "securities can be purchased in a fair and orderly market ..." § 78fff–2(d).

The trustee argues that even if these were not customer name securities, claimants have net equity claims for securities, which he may satisfy by transferring to claimants from the Debtor's inventory the number of MSM shares purchased by each claimant. The claimants argue on a number of grounds that their claims are for net equity in cash, which can be satisfied only by repayment of the cash deposited with the Debtor to purchase the MSM stock in question.

■ Claimants first argue that they have a net equity claim for cash if the securities could not be purchased by the filing date, citing *S.E.C. v. Aberdeen Securities Co.*, 480 F.2d 1121 (3d Cir.), *cert. denied sub nom. Seligsohn v. S.E.C.*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 138 (1973) and *Matter of Investors Security Corp.*, 6 B.R. 415 (Bankr.W.D.Pa.1980). These cases are factually distinguishable. In *Aberdeen Securities*, claimants placed an order to purchase a prospective new issue. The stock was never issued. Under these circumstances, the court of appeals concluded: "because the facts demonstrate that since this particular stock was not in existence, the purchase never could be made. [Claimants], therefore, do not have a claim for the stock itself." *Aberdeen Securities*, 480 F.2d at 1127. In *Investor Security*, claimants had invested cash with the debtor in order to purchase securities (certificates of deposit). The securities apparently were never purchased. Prior to the SIPA proceeding, and around what should have been the maturity date of the certificates of deposit, claimants unsuccessfully attempted to recover their cash. Recognizing that they would recover more under SIPA if their claim was for securities rather than cash,[3] claimants argued during the SIPA proceeding that they held a claim for securities. The court ruled against claimants.

In *Aberdeen Securities* and *Investor Security*, unlike this case, the securities either never could be purchased, or, if purchased, would have matured into cash prior to the filing date. Further, and perhaps more relevant, both cases were decided un-

---

**3.** Claims for securities were at that time protected up to $50,000, while claims for cash were protected up to $20,000.

der the version of SIPA which was in effect prior to the 1978 enactment of § 78fff–2(d). Section 78fff–2(d) eliminates any requirement that securities be purchased prior to the filing date. It provides in part:

(d) *Purchase of securities.* The trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities based on securities under section 78fff–1(b)(1) of this title and for the transfer of customer accounts under subsection (f) of this section, in order to restore the accounts of such customers as of the filing date . . . .

The legislative history explains the reason for the enactment of this provision:

Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. Instead, when the customer claims for a security exceed the supply available to the trustee in the debtor's estate, then customers generally receive pro rata portions of the securities claims, and as to any remainder, they receive cash based on the market value as of the filing date (normally the date the liquidation proceeding is initiated) . . .

The principal underlying the purpose of the bill is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities. By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties. S.Rep.No. 763, 95th Cong., 2d Sess. 2 (1978), reprinted in [1978] U.S. Code Cong. & Admin News 764, 765 (emphasis added).

It seems clear that in the present case, claimants' legitimate expectations were that their accounts held MSM stock as of the filing date. Indeed, some claimants initially filed claims for securities. Under the facts presented, the statutory scheme requires a finding that claimants are entitled to securities, not cash.

■ Claimants next argue that under Oregon law, the sale was not complete because delivery of the securities had not occurred as of the date of filing. Therefore, claimants argue, they have a claim for cash. The delivery issue is irrelevant since there is nothing in SIPA to indicate that a transaction must have been completed before a net equity claim based upon securities can arise. Again, § 78fff–2(d), which expressly allows the trustee to purchase shares of stock to satisfy claims for net equities based on securities, refutes this argument. Obviously, if no stock had been purchased for the claim, then a sale could not be complete and there could be no delivery under state law. Nonetheless, § 78fff–2(d) indicates that net equity claims based upon securities can exist under these circumstances.

MSM was not registered with the Securities Exchange Commission or the Oregon Corporation Division. Claimants' final argument is that under Oregon law, transactions in unregistered securities are void *ab initio* and, therefore, that they have claims for cash because their attempted purchase of MSM stock had no legal effect. The trustee argues that transactions in unregistered securities are not void, but rather are voidable at the option of the purchaser. Claims for rescission or fraud are general claims under SIPA and are not entitled to preferred "customer status." *S.E.C. v. S.J. Salmon & Co.,* 375 F.Supp. 867, 871 (S.D.N.Y.1974).

Claimants rely primarily on three older Oregon cases, *Pennicard v. Coe,* 124 Or. 423, 263 P. 920 (1928) and the companion case *Moe v. Coe,* 124 Or. 436, 263 P. 925 (1928); and *Downs v. Nat'l Share Corp.,*

152 Or. 546, 55 P.2d 27 (1936).[4] The Oregon Supreme Court clearly stated in these cases that transactions in violation of the Blue Sky law are void. The Blue Sky law if effect when *Pennicard, Moe,* and *Downs* were decided did not expressly state that transactions in unregistered securities, or by unregistered brokers, were void. Nor did the statutory scheme specifically provide relief to a purchaser who had traded in unregistered securities or with an unregistered broker. The court in *Pennicard* relied upon a statutory provision making it a crime to sell unregistered securities.[5] The court in *Downs* relied upon the statutory provision requiring registration of dealers and brokers.[6] The court reasoned that "the purpose of these statutes in requiring a license is manifestly for police regulation and the protection of the public; therefore, sales by unlicensed persons or corporations are void." *Downs,* 152 Or. at 556, 55 P.2d at 31. In each case, the purchaser was awarded judgment for the amount paid to purchase the stock.

Subsequently, in the 1939 revision of the Oregon securities laws, the legislature inserted a section specifically declaring sales in violation of the Blue Sky law to be void, and providing the measure of relief for such violation. Or. Laws of 1939, ch. 397, § 19(1). When the securities laws were again revised in 1967, the legislature omitted the provision that sales in violation of the Act are void.[7] The omission is highly relevant and leads to the conclusion that sales in violation of the Act are not void under current law. "In the construction of amendatory acts, it is presumed that material changes in language create material changes in meaning." *Fifth Avenue Corp. v. Washington Co.,* 282 Or. 591, 597, 581 P.2d 50, 54 (1978) (citing 1A Sutherland, Statutory Construction, § 22.30 (1972)). Claimants' argument that the use of the word "void" in the *Pennicard* and similar cases means "void", not "voidable", overlooks the subsequent history of the Oregon securities statutes. When the legislature deleted the term "void" from the statute in 1967, it must have done so purposefully. The logical implication is that after the 1967 amendments, sales of securities in violation of the relevant Oregon statute are voidable, not void.

This logical implication is bolstered by the provisions of the statute itself. ORS 59.115(2)(a) allows a purchaser to recover, upon tender of the security, the price paid plus interest. In other words, the purchaser may rescind the transaction. In the alternative, under ORS 59.115(2)(b) the purchaser may recover even if he has resold the security. If the initial transaction was void and of no legal effect, a valid resale would not be possible. Yet this provision was specifically inserted to protect a buyer who has in fact resold and cannot tender back the securities.

ORS 59.115 "basically follows the Uniform Securities Act ...." Hearing on

---

4. See also *Salo v. Northern Savings & Loan Ass'n,* 140 Or. 351, 12 P.2d 765 (1932).

5. Or. Laws, § 6848, L. 1915, ch. 324, § 20.

6. Or. Code of 1930, § 25–1313.

7. Present ORS 59.115 provides in part:
   59.115 Liability of person offering or selling securities unlawfully; limitations on proceeding.
   (1) Any person who:
     (a) Offers or sells a security in violation of the Oregon Securities Law or of any rule or order of the commissioner, or of any condition, limitation or restriction imposed upon a registration under the Oregon Securities Law;
   ...
        *   *   *   *   *   *

is liable as provided in subsection (2) of this section to the person buying the security from him.
(2) The purchaser may recover, in addition to costs and reasonable attorney fees at trial and on appeal:
  (a) Upon tender of the security, the consideration paid for the security, and interest from the date of payment at the rate of six percent per annum, or at the rate provided in the security if the security is an interest-bearing obligation, less any amount received on the security; or
  (b) If he no longer owns the security, damages in the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and less interest on such value at the rate of six per cent per annum from the date of disposition.

H.R. 1299 before the Senate Judiciary Committee, Appendix A at 14 (May 8, 1967). Professor Loss, draftsman of the Uniform Securities Act, explains:

> In providing for damages as an alternative to rescission, § 410(a) [of the Uniform Securities Act] [section 410(a) includes a damages provision similar to ORS 59.115(2)(b)] is a necessary improvement upon many of the present provisions, which condition the plaintiff's right of recovery on his being in a position to make good tender ... Today, therefore, a buyer who has resold in order to cut his losses before discovering that he might get his money back under the statute is in an unfortunate position.[8]

Claimants contend that in *Bronson v. Moonen,* 270 Or. 469, 528 P.2d 82 (1974), the Oregon Supreme Court reaffirmed the holding in *Pennicard.* However, a close reading of *Bronson* belies claimants' contention. In *Bronson,* which did not involve the sale of securities, the court found it unnecessary to determine the void/voidable issue, stating, "[t]here is no need in this case to pause and determine whether the contract of sale is void or voidable. It was at least voidable." *Id.* at 479, 528 P.2d at 87. The court did not discuss *Pennicard* or the subsequent evolution of Oregon securities law, and only cited *Pennicard* as a "case[] hold[ing] that a contract made in violation of a statute enacted 'for the protection of the public' is void." *Id.* at 479 n. 1, 528 P.2d at 87 n. 1. More relevant for purposes of the present discussion is the Supreme Court's statement in *Mountain Fir Lumber Co. v. E.B.I. Co.,* 296 Or. 639, 643 n. 3, 679 P.2d 296, 299 n. 3 (1984):

> The word "void" when applied to legally questionable agreements or other transactions may be overly broad, if it is taken to mean that such agreements have no legal effects. Ordinarily what is meant is that the illegal contract is not enforceable between the parties (or, if "voidable," can be set aside by either of them). The substance and purpose of the rule

that makes the agreement illegal determines in what respect the agreement cannot be effective. In this case, for example, we do not imply that Mt. Fir's employees were not covered by the contract.

Claimants may well have had a right of rescission under Oregon law. This right, however, is not the equivalent of a net equity claim for cash under SIPA. *S.E.C. v. S.J. Salmon & Co.,* 375 F.Supp. at 371.

### CONCLUSION

For the foregoing reasons, the court concludes that claimants' accounts held securities, not cash, on the filing date. Claimants have net equity claims for securities. Therefore, the trustee's motion for summary judgment is granted, claimants' motion for summary judgment is denied, and claimants' objection to the trustee's determination is also denied. Counsel for the trustee is directed forthwith to prepare, serve, and lodge an appropriate order.

---

**8.** L. Loss, *Commentary on the Uniform Securities Act* 148 (1976). Professor Loss also refers to transactions in violation of the securities laws as being "voidable." *Id.* at 146.